UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

BNSF RAILWAY COMPANY,

          Plaintiff,

    v.

GILSTER-MARY LEE CORPORATION,
ACE AMERICAN INSURANCE
COMPANY and ACE PROPERTY AND
CASUALTY INSURANCE COMPANY,

          Defendants.

Case No. 15-cv-250-JPG-SCW

**MEMORANDUM AND ORDER**

This matter comes before the Court on two motions for summary judgment, one filed by

plaintiff BNSF Railway Company ("BNSF") (Doc. 85) and the other filed by defendant

Gilster-Mary Lee Corporation ("GML") (Doc. 87).   BNSF's motion seeks summary judgment

only on Count II.   GML has responded to that motion (Doc. 90), and BNSF has replied to that

response (Doc. 92).   GML seeks summary judgment on Counts I, II and III.   BNSF has

responded to that motion (Doc. 89), and GML has replied to that response (Doc. 91).

I.      **Background**

This case arose after a BNSF employee, Cecil A. Parrish, was injured while working for

BNSF at GML's rail yard.   He was injured using a pry bar to align two railcars on a curved track

in the rail yard.   Parrish filed a lawsuit against BNSF under the Federal Employers' Liability Act

("FELA"), 45 U.S.C. § 51 *et seq.*:   *Parrish v. The Burlington Northern and Santa Fe Railway

Company*, No. 13-cv-1054-JPG-SCW.   BNSF and Parrish settled that lawsuit.

In the case at bar, BNSF seeks to hold GML and its insurers, defendants ACE American

Insurance Company and ACE Property and Casualty Insurance Company (collectively, the "ACE

defendants"), liable for the costs of the defense in *Parrish* and the settlement amount.   It believes a written Industry Track Agreement (the "Sidetrack Agreement") between BNSF and GML (Count I) as well as a common law duty of implied indemnity (Count III) obligate GML to indemnify it for those amounts.   BNSF also believes GML breached the Sidetrack Agreement by failing to name BNSF as an additional insured on an insurance policy that covered BNSF's liability and defense in *Parrish* (Count II).   BNSF tendered the defense of the case to GML and asked GML to initiate an insurance claim on its behalf, but GML refused.

Following a previous round of summary judgment motions, the Court found as a matter of law that GML did not agree in the Sidetrack Agreement to indemnify BNSF for BNSF's own negligence and that neither of the insurance policies issued by the ACE defendants provided coverage for BNSF for losses from the *Parrish* lawsuit (Doc. 84).

In the current round of summary judgment motions, both parties seek summary judgment on Count II, the claim for breach of the promise to obtain insurance in the Sidetrack Agreement. BNSF relies on the Court's finding in its prior summary judgment order to argue GML breached the Sidetrack Agreement by failing to provide liability insurance that would cover liability for Parrish's injury.   On the other side, GML argues the Sidetrack Agreement only obligated it to name BNSF as an additional insured on an *automobile* insurance policy, not a general liability policy.   In any case, it contends, even if it were required to obtain general liability insurance naming BNSF as an additional insured, it complied with the Sidetrack Agreement with the ACE policy it purchased.   Additionally, GML argues that BNSF waived the insurance requirement.

GML also seeks summary judgment on Count I for contractual indemnity and Count III for implied indemnity.   With respect to Count I, GML argues that it was not negligent in any way

with respect to Parrish's injury because it owned him no duty.   As a consequence, it argues, the Sidetrack Agreement does not obligate it to indemnify BNSF for any of the costs stemming from Parrish's injury.   In response, BNSF argues GML was negligent in a number of ways and that its liability stems from its contractual obligation to provide a safe workplace.

With respect to Count III, GML argues that BNSF does not satisfy the requirements for implied indemnity, which include being completely blameless.   BNSF maintains that the relative fault of the parties – and whether BNSF is blameless – is a question for the jury to decide.

## II.   Summary Judgment Standard

Summary judgment must be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."   Fed. R. Civ. P. 56(a); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Spath v. Hayes Wheels Int'l-Ind., Inc.*, 211 F.3d 392, 396 (7th Cir. 2000).   The reviewing court must construe the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in favor of that party.   *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986); *Chelios v. Heavener*, 520 F.3d 678, 685 (7th Cir. 2008); *Spath*, 211 F.3d at 396.

The initial summary judgment burden of production is on the moving party to show the Court that there is no reason to have a trial.   *Celotex*, 477 U.S. at 323; *Modrowski v. Pigatto*, 712 F.3d 1166, 1168 (7th Cir. 2013).   Where the non-moving party carries the burden of proof at trial, the moving party may satisfy its burden of production in one of two ways.   It may present evidence that affirmatively negates an essential element of the non-moving party's case, *see* Fed. R. Civ. P. 56(c)(1)(A), or it may point to an absence of evidence to support an essential element of the non-moving party's case without actually submitting any evidence, *see* Fed. R. Civ. P.

3

56(c)(1)(B).   *Celotex*, 477 U.S. at 322-25; *Modrowski*, 712 F.3d at 1169.   Where the moving

party fails to meet its strict burden, a court cannot enter summary judgment for the moving party

even if the opposing party fails to present relevant evidence in response to the motion.   *Cooper v.

Lane*, 969 F.2d 368, 371 (7th Cir. 1992).

       In responding to a summary judgment motion, the nonmoving party may not simply rest

upon the allegations contained in the pleadings but must present specific facts to show that a

genuine issue of material fact exists.   *Celotex*, 477 U.S. at 322-26; *Anderson*, 477 U.S. at 256-57;

*Modrowski*, 712 F.3d at 1168.   A genuine issue of material fact is not demonstrated by the mere

existence of "some alleged factual dispute between the parties," *Anderson*, 477 U.S. at 247, or by

"some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co. v. Zenith Radio

Corp.*, 475 U.S. 574, 586 (1986).   Rather, a genuine issue of material fact exists only if "a

fair-minded jury could return a verdict for the [nonmoving party] on the evidence presented."

*Anderson,* 477 U.S. at 252.

## III.    Discussion

       Because the two general issues in the pending motions – indemnity and insurance coverage

– turn on facts about different aspects of this case, the Court sets forth the facts separately,

followed by analysis of each issue.

       A.    <u>Counts I and III:   Indemnity Issues</u>

          1.    <u>Facts</u>

Viewed in the light most favorable to BNSF, the evidence establishes the following

relevant facts.

Cecil Parrish was an employee of BNSF.   When he first began working for BNSF, BNSF

4

trained him to do his job.   It provided him a training booklet, the train yard and engine safety rules ("Safety Rules"), which included instructions about how to couple and uncouple railcars and locomotives.   Coupling involves aligning a drawbar on the railcar coupler and a drawbar on the locomotive coupler so that when they impact each other, the knuckles of the couplers automatically attach to allow the locomotive to pull the railcar.   When couplers are not aligned – or mismatched, in the language of the Safety Rules – they must be adjusted into alignment either by hand or using a device such as, for example, various types of bars listed in the Safety Rules. The Safety Rules describe the adjustment procedure, but no BNSF employee ever actually demonstrated to Parrish use of the specific devices mentioned in the Safety Rules.

On April 12, 2013, Parrish was working for BNSF at GML's Centralia, Illinois, rail yard within fifty feet of track owned and maintained by GML.   BNSF would run railcars full of sugar into GML's Centralia plant, which GML would use to manufacture cake mixes, and would remove empty railcars from the yard.   GML employees would instruct BNSF employees which railcars to move where and would observe the railcar movement, but they would not participate in the actual movement.   The Sidetrack Agreement, a standard agreement BNSF drafted and executed with the owners of industrial facilities on which BNSF provided rail service by a track other than the main track, governed the arrangement between BNSF and GML regarding BNSF's rail service to the GML plant.   In the Sidetrack Agreement, GML agreed, among other things, "to provide a safe workplace for [BNSF] employees."   Sidetrack Agmt. § 2(a) (Doc. 1-1 at 1).   Further, as explained in the Court's June 30, 2016, order, in § 8(a) of the Sidetrack Agreement, GML agreed to indemnify BNSF for losses BNSF incurs as a result of GML's fault or negligence in proportion to GML's comparative degree of fault or negligence.[1]

---

[1] The indemnity clause in the Sidetrack Agreement states:

On that day, Paul Spieth, a GML yard operator, instructed Parrish where to put the loaded railcars being delivered and which empty railcars to pull out of the yard, and then GML's yard manager Elmer Patten observed the operation.   Spieth's instruction did not include any direction about how to accomplish the mechanics of the movement such as, for example, how to couple or uncouple railcars.   When Parrish tried to couple an empty railcar with a locomotive in preparation for moving the railcar out, he was faced with mismatched couplers that he was unable to move by hand.

As he had once or twice a week on numerous other occasions when adjusting couplers in the GML yard, Parrish retrieved a pry bar that was kept near where he was working.   The pry bar had been kept there for about three years.   Parrish thought the bar was of a type mentioned in the Safety Rules as appropriate for adjusting couplers, and he had been taught to use the pry bar for that purpose by other BNSF employees.   It was actually a pry bar GML provided for its employees to use to open outlet valves of full railcars.   BNSF had not provided Parrish with any other device to assist in adjusting mismatched couplers, had not observed Parrish using the pry

---

> [GML] shall indemnify and save harmless [BNSF] from any and all claims, demands, suits, losses, judgments, costs, damages, or expenses on account of injuries to or death of any and all persons whomsoever, and any and all loss or destruction of or damage to property to whomsoever belonging, including property owned by, leased or rented to, or in the care, custody or control of the parties hereto, arising or growing out of or in any manner connected with the maintenance, operation, and use of the Track and crossings covered by this Agreement, or caused or occasioned, in whole or in part, by reason of or arising during the presence of the person of [GML], its subcontractors, the employees or agents of either, or third parties upon or in proximity to the Track covered by this Agreement.   If any claim or liability shall arise from the joint or concurring negligence of the parties hereto, it shall be borne by them in proportion to the degree of fault or negligence of both of them as provided by law.

Sidetrack Agmt. § 8(a) (Doc. 1-1 at 4).

bar[2], but had also not instructed Parrish not to use GML's pry bar.   At least two GML employees, Spieth and Patten, had seen Parrish and other BNSF employees using its pry bar for years to adjust couplers on numerous prior occasions and had never told them not to use the bar.

Unlike every other time Parrish had used the pry bar to adjust a coupler, when he used it on April 12, 2013, it slipped.   Parrish fell, snapping his ankle sideways at a ninety degree angle to his leg.

       3.    <u>Analysis</u>

In its motion, GML asks the Court to grant summary judgment on Count I on the grounds that the evidence conclusively establishes that GML bore no fault whatsoever in Parrish's accident because BNSF was exclusively responsible for training its employees to adjust mismatched railcar couplers and for supervising its employees in that operation.   BNSF maintains that GML owed it a contractual duty to provide a safe workplace for BNSF employees, and that it is a question of fact for a jury whether GML breached that duty and, consequently, bears some responsibility for Parrish's accident.   It points to three ways GML was potentially negligent: (1) making the bar available to Parrish to use in coupling railcars, (2) having a curved track that required couplers to be adjusted and (3) directing BNSF to place certain cars on the curved track.   In reply, GML argues that BNSF has not provided any evidence that GML was negligent because of its curved track design or its direction to Parrish to put cars on the curved track.   GML notes that it did not design the track, which was installed prior to its acquisition of the facility, and that BNSF has pointed to no evidence from which a reasonable jury could find coupling railcars on a curved track

---

[2] In his first deposition, taken April 14, 2014, Parrish testified that his supervisors had tested him using the pry bar, Parrish dep. I 96:22-25 (Doc. 88-9), but in his second deposition, taken July 8, 2016, he testified that he could not say for sure that they had, Parrish dep. II 13:20-14:1 (Doc. 88-10).   Because the Court resolves conflicting evidence in favor of BNSF for GML's motion for summary judgment, the Court must assume BNSF did not know Parrish was using the pry bar.

is an unreasonably dangerous activity.    It also argues that it did not "provide" the pry bar to Parrish such that it could be negligent.

Here, whether GML owes contractual indemnity in any amount to BNSF depends on whether GML was negligent or at fault in Parrish's injury.    The Sidetrack Agreement requires indemnity only in proportion to GML's negligence or fault as compared with BNSF's:   "If any claim or liability shall arise from the joint or concurring negligence of the parties hereto, it shall be borne by them in proportion to the degree of fault or negligence of both of them as provided by law."   Sidetrack Agmt. § 8(a) (Doc. 1-1 at 4).    Thus, although the contractual duty to indemnify is a matter of contract law, *see Burlington N., Inc. v. Hughes Bros., Inc.*, 671 F.2d 279, 284 (8th Cir. 1982), the parties have chosen to measure their contractual liability using a fault or negligence standard, that is, "the degree of fault or negligence of both of them as provided by law."   Sidetrack Agmt. § 8(a) (Doc. 1-1 at 4).    The Court therefore finds it appropriate to apply Illinois negligence law to determine the apportionment of fault and, therefore, the magnitude of the indemnity GML owes, if any.

To be negligent under Illinois law, the defendant must have owed a duty, breached the duty, and caused injury because of that breach.   *Bell v. Hutsell*, 955 N.E.2d 1099, 1104 (Ill. 2011). GML claims, however, that it owed no duty.   However, the Sidetrack Agreement clearly creates a duty for GML "to provide a safe workplace for [BNSF] employees."   Sidetrack Agmt. § 2(a) (Doc. 1-1 at 1).

Even absent such a duty assumed by contract, under the common law understanding of duty, a duty would exist.

> The touchstone of the duty analysis is to ask whether the plaintiff and defendant stood in such a relationship to one another that the law imposes on the defendant an obligation of reasonable conduct for the benefit of the plaintiff.   The inquiry

8

> involves four factors:   (1) the reasonable foreseeability of the injury; (2) the likelihood of the injury; (3) the magnitude of the burden of guarding against the injury; and (4) the consequences of placing the burden on the defendant.

*Krywin v. Chicago Transit Auth.*, 938 N.E.2d 440, 447 (Ill. 2010).   In this case, the relationship between GML and BNSF, as reflected in the Sidetrack Agreement, imposed a duty of reasonable conduct on GML toward BNSF's employees working on GML's tracks   It was reasonably foreseeable that a BNSF employee using a GML pry bar – which GML knew was readily accessible yet clearly not intended for railroad use – could get hurt as a result of misusing that pry bar for railroad purposes.   Additionally, it was a small burden either to remove the misused pry bar from a place where BNSF employees could access it or to instruct BNSF employees not to use the pry bar for railroad purposes.   Finally, there would be no serious consequences from tasking GML with controlling the use of its own pry bar.   Therefore, even if the common law provided the rule for determining the existence GML's duty, it would establish one in this case.

The Court further finds that a reasonable jury could find that GML breached this duty and that the breach caused Parrish's injuries.   GML employees knew for years that BNSF employees were using a pry bar designed for use by GML employees for a completely different purpose. Arguably, the ease with which Parrish could access and use the pry bar, which he believed to be an appropriate tool, rendered the workplace unsafe.   GML easily could have asserted control over its own pry bar to prohibit or prevent its use for an inappropriate purpose.   A reasonable jury could find that by failing to do this, GML was negligent and consequently bore some responsibility for Parrish's accident.   Therefore, GML has not carried its burden of showing it is entitled to judgment as a matter of law on BNSF's contractual indemnity claim in Count I.[3]

---

[3] Because the Court finds sufficient evidence from which a reasonable jury could find GML at fault in connection with the availability of the pry bar, it need not consider whether there is sufficient evidence from which a jury could find GML at fault in connection with the track design

For similar reasons, the GML is not entitled to summary judgment on BNSF's implied indemnity claim in Count III.   "The right to common law implied indemnity is available to 'a tortfeasor whose liability is vicariously imposed by policy of law rather than culpability of conduct.'"  *Travelers Cas. & Sur. Co. v. Bowman,* 893 N.E.2d 583, 590 (Ill. 2008) (quoting *Allison v. Shell Oil Co.*, 495 N.E.2d 496, 501 (Ill. 1986)).   In Count III, BNSF claims it is blameless in Parrish's injury, although liable under FELA simply because of its employer status, and that GML actually and solely caused Parrish's injury.   While it appears to the Court that it is likely BNSF may bear at least some culpability for Parrish's accident – after all, it settled Parrish's lawsuit for a substantial sum – the allocation of fault is a job for the jury, as explained above in connection with Count I.   The Court will not foreclose an implied indemnity claim until the jury has made its decision, and if BNSF bears any fault, its implied indemnity claim will fail.   Because this is a question for the jury, the Court will not grant summary judgment on Count III.

 B. <u>Count II:   Insurance</u>

  1. <u>Facts</u>

The facts with respect to Count II are essentially undisputed.   The Sidetrack Agreement was executed in 1998.   It states, in pertinent part:

> Section 7.(a) [GML] shall, at its expense, procure and maintain throughout the term of this Agreement, and thereafter until any [GML]-owned improvements are removed from the Property, a comprehensive general form of insurance covering liability, including, but not limited to, Public Liability, Personal Injury and Property Damage, as well as Contractual Liability in the amount of $1,000,000 per occurrence and $2,000,000 in the aggregate.   Such insurance shall contain no exclusion with respect to property of [BNSF] in the care, custody or control of [GML].   [GML] also shall, at its expense, procure and maintain throughout the term of this Agreement, an automobile liability policy with limits of $1,000,000 covering "any auto".   [BNSF] SHALL BE NAMED AS AN ADDITIONAL

---

or GML's instruction to Parrish to move railcars sitting on the curved portion of the track.

INSURED PARTY COVERED BY THE POLICY.

(b)     All risk insurance on the property of [GML], or in [GML]'s care, custody and control, shall contain a waiver of subrogation of claims against [BNSF].   [GML] shall maintain Workers Compensation insurance which shall contain a waiver of subrogation against [BNSF].

(c)     All insurance shall be placed with insurance companies licensed to do business in the state in which the Property is located, with a current Best's Insurance Guide Rating of A- and Class X, or better. [GML] shall provide, and thereafter maintain in effect, a current Certificate of Insurance evidencing such insurance and said Certificate shall reference this contract number.   Insurance must provide for coverage of incidents occurring within fifty (50) feet of a railroad track, and any provision in the insurance policy to the contrary must be specifically deleted.   Each policy shall provide that it shall not be canceled or materially changed unless at least thirty (30) days' prior written notice of cancellation or change shall have been mailed by the insurance company to [BNSF] at the address designated herein.

(d)     The furnishing of insurance required by this section shall in no way limit or diminish the liability or responsibility of [GML] as provided under any section of this Agreement.

Sidetrack Agmt. § 7 (Doc. 1-1 at 3-4).

        GML purchased a comprehensive general liability ("CGL") insurance policy from one of the ACE defendants and named BNSF as an additional insured.   However, the Court has already determined as a matter of law that the ACE CGL policy did not cover BNSF for losses from the *Parrish* lawsuit because of the circumstances of the accident; the policy did not cover an employer for its own employee's injuries (Doc. 84).   GML never provided BNSF with a copy of the ACE CGL policy and may have sent BNSF a copy of the certificate of insurance mentioned in § 7(c) in 1998 and in 2002, both prior to issuance of the ACE CGL policy.   BNSF never objected to the insurance coverage provided by GML pursuant to the Sidetrack Agreement until Parrish's injury

11

became an issue.   Shortly after Parrish's accident, BNSF made numerous efforts to obtain copies of the CGL insurance policy GML was obligated to obtain under the Sidetrack Agreement.   The Court has already found that, after this litigation began, BNSF diligently attempted to secure the ACE CGL policy (Doc. 32).   GML provided a copy of the ACE CGL policy in July 2015.

   2. <u>Analysis</u>

  Both parties have moved for summary judgment on Count II.   BNSF maintains that the failure to provide CGL insurance covering BNSF for the Parrish accident breached § 7 of the Sidetrack Agreement, so it is entitled to summary judgment.   Specifically, BNSF argues, the policy did not cover all "incidents occurring within fifty (50) feet of a railroad track," and GML did not require that "any provision in the insurance policy to the contrary . . . be specifically deleted," as required by § 7(c) of the Sidetrack Agreement.

  On the other side, GML argues that § 7(a) of the Sidetrack Agreement unambiguously required it only to name BNSF as an additional insured on the *automobile* insurance policy, noting that the final sentence of § 7(a) refers to "the policy" in the singular, clearly referring only to the automobile policy mentioned in the immediately preceding sentence.   Alternatively, GML argues that if the Sidetrack Agreement required it to purchase CGL insurance naming BNSF as an additional insured, it did so by naming GML as an additional insured on the ACE CGL policy. GML maintains that whether the CGL policy actually covered liability from Parrish's accident is immaterial to whether it complied with any obligation § 7(a) to purchase CGL coverage for BNSF. GML further notes that its failure to provide a certificate of insurance as required by the Sidetrack Agreement caused BNSF no damage.   Finally, GML argues that BNSF waived the right to contest compliance with § 7(a) because it failed to raise the issue of insufficient coverage or to request a

certificate of insurance to check compliance with the Sidetrack Agreement from 1998 to 2013.

In response to GML's arguments, BNSF maintains that the automobile coverage portion of § 7(a) simply means that the single insurance policy required must also cover automobile liability, so the final clause referring to "the policy" applies to all types of coverage listed earlier in the paragraph.   Alternatively, it argues that the use of the singular "the policy" creates an ambiguity because it is at the conclusion of a paragraph mentioning two policies.   The ambiguity, BNSF argues, must be construed in light of the other evidence in the case showing that both parties assumed and acted as if the requirement to name BNSF as an additional insured applied to the CGL coverage and, indeed, GML added BNSF as an additional insured on the ACE CGL policy. Finally, BNSF argues it did not waive the insurance requirements in § 7 of the Sidetrack Agreement because it did not even know the CGL insurance provided by GML was insufficient.

a.    CGL v. Automobile Policy

The Court first addresses GML's contention that the Sidetrack Agreement only obligates it to name BNSF as an additional insured on an automobile policy.   This requires interpretation of the Sidetrack Agreement under principles of Illinois law, which provide that when construing a contract, the Court must give effect to the intent of the parties.   *Gallagher v. Lenart*, 874 N.E.2d 43, 58 (Ill. 2007); *Virginia Sur. Co. v. Northern Ins. Co. of New York*, 866 N.E.2d 149, 153 (Ill. 2007).   The Court must first attempt to determine this intent solely from the plain and ordinary meaning of the contract language, which is usually the best indication of the parties' intent. *Gallagher*, 874 N.E.2d at 58; *Virginia Sur.*, 866 N.E.2d at 153.   The Court should also consider the contract as a whole because words often derive their meaning from their context.   *Gallagher*, 874 N.E.2d at 58**.**   It may also consider the custom and usage of terms within a certain industry to

understand the parties' intent.   *Intersport, Inc. v. National Collegiate Athletic Ass'n,* 885 N.E.2d 532, 539 (Ill. App. Ct. 2008).   If the language so viewed is susceptible to more than one meaning, it is ambiguous, and the Court may consult extrinsic evidence to determine the parties' intent. *Gallagher*, 874 N.E.2d at 58.   One type of extrinsic evidence of the parties' intent is their conduct subsequent to formation of the contract.   *Szafranski v. Dunston*, 34 N.E.3d 1132, 1157 (Ill. App. Ct.), *app. denied*, 39 N.E.3d 1012 (Ill. 2015), *cert. denied*, 136 S. Ct. 1230 (2016).

The plain language of § 7(a) is ambiguous.   The reference to "the policy" following a requirement that GML "shall, at its expense, procure and maintain . . . a comprehensive general form of insurance [and] an automobile liability policy" could be interpreted to refer to either policy individually, or it could be construed as grammatically incorrect reference to both policies. Considering the purpose of the Sidetrack Agreement to govern the relationship between GML and BNSF in connection with the GML rail yard, it would be absurd to find it required GML to name BNSF as an additional insured only on an automobile insurance policy, a minute aspect of the relationship between the two parties.   In fact, one of the primary purposes of a sidetrack agreement is to allocate liability for a wide range of losses arising out of the use of the sidetrack, not just liability connected to an automobile.   *See* International Risk Management Institute, Inc., Railroad Sidetrack Agreement, https://www.irmi.com/online/insurance-glossary/terms/r/ railroad-sidetrack-agreement.aspx (visited Mar. 23, 2017) (defining railroad sidetrack agreement as "[a]n agreement between a railroad and a business in which the railroad agrees to build a siding on the property of the business, and the business will hold the railroad harmless for certain liability arising out of the use of the sidetrack").

Additionally, the parties' post-formation conduct reflects their intent that the Sidetrack

14

Agreement require GML to name BNSF as an additional insured on its CGL policy.   The parties admit numerous times in discovery that they believed § 7 required GML to name BNSF as an additional insured on GML's CGL policy and, indeed, named BNSF as an additional insured on the ACE CGL policy in order to comply with § 7(a) of the Sidetrack Agreement.

In sum, the language and context of the Sidetrack Agreement and the parties' post-agreement conduct reveal that they intended the Sidetrack Agreement to obligate GML to name BNSF as an additional insured on its CGL policy.   The Court rejects GML's cramped reading otherwise.

b.   <u>Naming of Additional Insured</u>

GML argues it has satisfied any obligation under § 7(a) of the Sidetrack Agreement by naming BNSF as an additional insured on the ACE CGL policy.   BNSF disputes this, pointing out that the ACE CGL policy did not cover Parrish's accident, which occurred within fifty feet of a railroad track.   It notes that § 7(c) obligated GML to "provide for coverage of incidents occurring within fifty (50) feet of a railroad track."

To understand whether GML satisfied its insurance obligations under the Sidetrack Agreement, the Court again must determine what the parties intended when they bargained for CGL coverage.   The Sidetrack Agreement, executed in 1998, essentially requires GML to name BNSF on a CGL insurance policy (1) for certain kinds of liability (including personal injury), (2) with certain dollar amounts of coverage ($1,000,000 per occurrence/$2,000,000 in the aggregate), (3) not to exclude BNSF's property in GML's care, custody and control, (4) with waivers of subrogation claims against BNSF, (5) from certain licensed insurance companies, (6) that covers incidents occurring within fifty feet of the track, and (7) that cannot be canceled or changed

15

without prior written notice to BNSF.   Sidetrack Agmt. § 7 (Doc. 1-1 at 3-4).   There are no more material details than that.   In this lawsuit, the only requirement BNSF claims GML breached was (6), the geographic coverage requirement because the ACE CGL policy did not cover Parrish's accident that occurred within fifty feet of the track.

The relevant question is whether the parties intended to require the CGL policy to provide unlimited coverage for any damage, injury or liability whatsoever within fifty feet of the track, as BNSF contends.   The Court finds they did not intend such sweeping coverage.   It is a fundamental principle of insurance coverage that insurers limit the scope of their policies' coverage by carefully describing what is covered, exclude certain liabilities that otherwise fall within that coverage, and except some circumstances from those exclusions.   This is just as true for CGL policies as any other insurance policies.   Thus, when the parties entered into the Sidetrack Agreement in 1998 to provide CGL coverage, they undoubtedly expected some limits on the coverage, whether they were because of the terms of the coverage or from exclusions.

The parties did not intend the geographical coverage requirement to supersede or negate the limitations on the type of liability covered.   Instead, the parties intended it to describe the minimum area for which the limited CGL coverage would apply – within fifty feet of the track, where most incidents implicating BNSF's potential liability were likely to occur.   So, for example, the GML CGL policy would not need to cover BNSF as an additional insured for an accident that occurred in a parking lot of the GML facility far from the track; it is unlikely BNSF would have liability in an area so remote from its operations in the GML rail yard.   This was the parties' intent when they included the fifty-foot requirement, not an expansion of the type of liability covered by the CGL policy.   Indeed, if Parrish's injury had been of the type of liability for

16

which BNSF was covered by the ACE CGL policy and had occurred thirty feet from the track, but the ACE CGL policy had only covered accidents within ten feet of the track, the policy would not have satisfied GML's obligations under § 7 of the Sidetrack Agreement.   However, that is not the case.

Here, GML obtained a CGL policy and named BNSF as an additional insured.   The failure of the policy to cover BNSF for liability from the *Parrish* lawsuit was not attributable to any failure on GML's part to obtain the required insurance containing the terms set forth in the Sidetrack Agreement.   Therefore, GML is entitled to summary judgment on Count II.

c.   <u>Waiver</u>

Because GML has prevailed on Count II, the Court need not consider whether BNSF waived its objection to the insurance provided by GML.   The Court notes, however, that BNSF's apparent failure to diligently check whether GML actually procured the insurance coverage BNSF thought it had is a major factor in why this lawsuit arose.   The evidence shows that, until this lawsuit, BNSF did not ever examine GML's CGL policies to ensure it was receiving what it believed it had bargained for and, if it was not getting the supposed benefit of its bargain, to renegotiate the bargain.   This would have been a wise course of action, especially in light of the insurance industry's progressive narrowing of additional insured coverage in its standard forms. *See* Scott P. Pence & William Cary Wright, *Not All Additional Insured Endorsements Are Created Equal: Brief History of ISO's Additional Insured Endorsements and 2013 Changes*, Under Construction (ABA/Forum on Construction Law, Chicago, Ill.), Vol. 15, No. 3, Aug. 2013, http://www.americanbar.org/publications/under_construction/2013/august_2013/iso_additional_i nsured_endorsements.html (visited Mar. 23, 2017).   However, the Court does not – and need not

17

– find BNSF has waived its breach of contract argument but simply notes a practical course that could have avoided this litigation.

## IV.    Conclusion

For the foregoing reasons, the Court:

- **DENIES** BNSF's motion for partial summary judgment on Count II (Doc. 85);

- **GRANTS in part** and **DENIES in part** GML's motion for summary judgment (Doc. 87). The motion is **GRANTED** to the extent it seeks summary judgment on Count II and is **DENIED** to the extent it seeks summary judgment on Counts I and III;

- **DENIES as moot** GML's motion to bifurcate the trial of Count I from the trial of Count II (Doc. 128);

- **ORDERS** that the parties shall have up to and including April 21, 2017, to respond to the pending motions *in limine* to which responses have not already been filed; and

- **DIRECTS** the Clerk of Court to enter judgment accordingly at the close of the case.

**IT IS SO ORDERED.**
**DATED:   March 29, 2017**

s/ J. Phil Gilbert
**J. PHIL GILBERT**
**DISTRICT JUDGE**

18